## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**SHARON WEINSTOCK**, individually,
as the legal guardian of plaintiff Geula Weinstock,
and as co-personal representative of the Estates of
Yitzchak Weinstock, Dov Weinstock,                                    Civ. No. 20-CIV-3021
Rabbi Simon Dolgin, and Shirley Dolgin;
**MOSHE WEINSTOCK**, individually,
as the legal guardian of Geula Weinstock,
and as co-personal representative of the Estates of
Yitzchak Weinstock, Dov Weinstock,
Rabbi Simon Dolgin, and Shirley Dolgin;
**GEULA WEINSTOCK**; **ARYEH WEINSTOCK**;
**CHAIM WEINSTOCK**; **ESTATE OF**
**YITZCHAK WEINSTOCK**; **ESTATE OF DOV**
**WEINSTOCK**; **ESTATE OF RABBI SIMON**
**DOLGIN**; and **ESTATE OF SHIRLEY DOLGIN**,

                                 Plaintiffs,

       *v.*

**REPUBLIC OF THE SUDAN**,

UNITED STATES OF AMERICA,
c/o United States Department of Justice
Civil Division
950 Pennsylvania Avenue, NW
Washington, DC 20530

MERRICK B. GARLAND, in his official capacity
As Attorney General of the United States of America
United States Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530

ANTONY J. BLINKEN, in his official capacity as
Secretary of State of the United States of America
United States Department of State
2201 C Street, NW
Washington, DC 20520

                               Defendants.

_____

**AMENDED COMPLAINT**

Plaintiffs, by counsel, bring this action for damages against the defendant, Republic of the Sudan ("Sudan") and for declaratory relief against defendants, United States of America, Merrick B. Garland, in his capacity as Attorney General of the United States, and Antony J. Blinken, in his capacity as Secretary of State of the United States. Plaintiffs allege as follows:

**INTRODUCTION**

1.      This is a civil action pursuant to the Foreign Sovereign Immunities Act, 28 U.S.C. § 1605A and supplemental causes of action, seeking damages for wrongful death, personal injury, and related torts, arising from a terrorist shooting on December 1, 1993, near Jerusalem, Israel, in which Yitzchak Weinstock, a 19-year-old U.S. citizen, was murdered (the "Terrorist Attack").

2.      The Terrorist Attack in which Yitzchak Weinstock was murdered was planned and carried out by Hamas – The Islamic Resistance Movement ("Hamas"), utilizing material support and resources provided by defendant Republic of the Sudan ("Sudan") and its agents.

3.      This action is brought by decedent Yitzchak Weinstock's estate, mother, and siblings, all of whom are U.S. citizens, the estate of his late father, and the estates of his late grandparents, both of whom were U.S. citizens.

4.      This action seeks damages directly and proximately caused by defendant Sudan and its agents and officials to Plaintiffs, by reason of Sudan's provision of material support and resources to Hamas, the terrorist organization that carried out the attack that killed Yitzchak Weinstock.

5.      After the original complaint was filed, the United States and Sudan entered into U.S.-Sudan Claims Settlement Agreement, Oct. 30, 2020, T.I.A.S. No. 21-209 (entered into force Feb. 9, 2021) (the "CSA") (Exhibit A hereto), which purported to espouse, settle, and/or cancel most, but not all, terrorism cases and claims against Sudan pursuant to the Terrorism Exception to

the FSIA. In exchange for the espousal of the terrorism claims, the CSA provided for compensation nearly all victims of Sudan-sponsored terrorism.

6.    Also after the original complaint was filed, and pursuant to the CSA, Congress enacted legislation that restored Sudan's sovereign immunity for its well-documented support of terrorism. See Sudan Claims Resolution Act, Consolidated Appropriations Act, 2021, Pub. L. No. 116-260 (2020), §§ 1701 *et seq.* (the "Act"). Exhibit B. Like the CSA, the Act benefitted nearly all victims of Sudan-sponsored terrorism.

7.    The ***only*** Sudan terrorism victims who received no compensation or other benefits for the extinguishment of their claims are the Plaintiffs herein and other U.S. national claimants all of whose claims arise out of Sudan-sponsored terrorist attacks carried out by the Hamas terrorist organization (the "Hamas Victims"). [1] All other known victims of Sudan-sponsored terrorism were either compensated under the CSA and the Act, were allowed to continue to pursue their claims, or both.

8.    Since the Complaint herein was filed, other courts in this district dismissed two other cases brought by Hamas Victims. *Mark v. Republic of the Sudan,* case no. 20-cv-3022 (D.D.C.); *Steinberg v. Republic of the Sudan*, civ. case no. 20-cv-2296 (D.D.C.). The *Mark* and *Steinberg* dismissals were affirmed by the D.C. Circuit. *Mark v. Republic of the Sudan*, 77 F.4th 892 (D.C. Cir. 2023), *cert. denied sub nom. Mark v. Sudan*, No. 23-708, 2024 WL 1839103 (U.S. Apr. 29, 2024); *Est. of Steinberg v. Republic of Sudan*, No. 23-5087, 2024 WL 718722 (D.C. Cir. Feb. 21, 2024).

---

[1] In addition to the instant case, the following civil actions have been brought against Sudan based upon its support for Hamas: *Mark v. Republic of the Sudan,* case no. 20-cv-3022 (D.D.C.); *Steinberg v. Republic of the Sudan*, case no. 20-cv-2296 (D.D.C.); *Force v. Republic of the Sudan*, case no. 20-cv-3027 (D.D.C.); and *Hirshfeld v Republic of Sudan*, case no. 20-cv-03029 (D.D.C.).

9. However, significant factual allegations raised herein were never pleaded in the *Mark* and *Steinberg* district court cases.

10. Additionally, Plaintiffs herein challenge the constitutionality of the CSA and the Act on the grounds that, individually and when taken together, they violate the Plaintiffs' right to equal protection of the laws or their right of access to the courts. Because the *Mark* and *Steinberg* decisions were dismissed for lack of subject matter jurisdiction, these legal issues were never properly presented to the courts in those cases.

11. Plaintiffs also challenge the constitutionality of the Act, as construed by the D.C. Circuit in *Mark v. Republic of the Sudan*, 77 F.4th 892 (D.C. Cir. 2023). As construed and applied in favor of Sudan, the Act precludes federal courts from even considering the Weinstocks' constitutional challenges. Accordingly, the Act violates the Due Process Clause and constitutional separation of powers.

12. These constitutional causes of action were never pleaded in the *Mark* and *Steinberg* district court cases. The complaints in those cases, like the original Complaint herein, were filed before the CSA was entered into and before the Act was passed.

## JURISDICTION

13. This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1330(a), 1331, 1346, and 1605A.

14. This Court has personal jurisdiction over defendant Sudan pursuant to 28 U.S.C. § 1330(b).

15. This District is the proper venue pursuant to 28 U.S.C. Section 1391(e) and (f).

16. The relief requested as to the U.S. Government Defendants is authorized pursuant to 28 U.S.C. § 2201 (declaratory relief) and pursuant to 28 U.S.C. § 2202 (injunctive relief). If

the requested injunctive relief is deemed by this Court to be an insufficient remedy, an alternative Writ of Mandamus request is authorized pursuant to 28 U.S.C. § 1361. An award of costs and fees is authorized pursuant to 28 U.S.C. § 2412.

## THE PARTIES

17.     Plaintiff Sharon Weinstock is and at all times was an American citizen. She is the mother, heir and co-personal representative of the estate of American citizen Yitzchak Weinstock, who was murdered in the Terrorist Attack. She is also the mother and co-legal guardian of plaintiff Geula Weinstock. She is also the widow and co-personal representative of the estate of Dov Weinstock, the late father and heir of Yitzchak Weinstock. She is also the co-personal representative of the estates of American citizens Rabbi Simon Dolgin, and Shirley Dolgin, the late grandparents of Yitzchak Weinstock. Sharon Weinstock brings this action individually, as legal guardian of plaintiff Geula Weinstock, and as personal representative of the estates of Yitzchak Weinstock, Dov Weinstock, Rabbi Simon Dolgin, and Shirley Dolgin.

18.     Plaintiff Moshe Weinstock is and at all times was an American citizen. He is the brother of decedent Yitzhak Weinstock, and co-personal representative of the estates of Yitzhak Weinstock, Dov Weinstock, Rabbi Simon Dolgin, and Shirley Dolgin. He is also the co-legal guardian of plaintiff Geula Weinstock. Moshe Weinstock brings this action individually, as the legal guardian of Geula Weinstock, and as personal representative of the estates of Yitzchak Weinstock, Dov Weinstock, Rabbi Simon Dolgin, and Shirley Dolgin.

19.     Plaintiff Geula Weinstock is and at all times was an American citizen. She is the sister of decedent Yitzhak Weinstock. Geula Weinstock is represented in this action by her legal guardians, Sharon Weinstock and Moshe Weinstock.

20.     Plaintiff Aryeh Weinstock is and at all times was an American citizen. He is the brother of decedent Yitzhak Weinstock.

21.     Plaintiff Chaim Weinstock is and at all times was an American citizen. He is the brother of decedent Yitzhak Weinstock.

22.     Plaintiff the Estate of Yitzchak Weinstock brings this action through its co- personal representatives, Sharon Weinstock and Moshe Weinstock.

23.     Plaintiff the Estate of Dov Weinstock brings this action through its co-personal representatives, Sharon Weinstock and Moshe Weinstock.

24.     Plaintiff the Estate of Rabbi Simon Dolgin brings this action through its co-personal representatives, Sharon Weinstock and Moshe Weinstock.

25.     Plaintiff the Estate of Shirley Dolgin brings this action through its co-personal representatives, Sharon Weinstock and Moshe Weinstock.

26.     At the time of the Attack and at the time this action was filed, Sudan was designated as a state sponsor of terrorism pursuant to section 6(j) of the Export Administration Act of 1979 (50 U.S.C. § 2405(j)). Sudan provided material support and resources for the commission of acts of extrajudicial killing, within the meaning of 28 U.S.C. § 1605A, including the Terrorist Attack, authorized and ratified the actions of its officials, employees and agents described herein, and performed other actions that facilitated, enabled, and caused the Terrorist Attack and the harm to the plaintiffs herein.

27. Defendant United States is the proper defendant in an action seeking to declare unconstitutional international agreements and statutes of the United States.

28. Defendant Attorney General Merrick Garland heads the United States Department of Justice ("DOJ"), which is the agency of the United States government responsible for enforcing

federal laws. Defendant Garland is sued herein solely in his official capacity as the public official with control over the conduct of the DOJ. Garland has ultimate responsibility for supervising all operations and functions of the DOJ, including regarding decisions whether and how to enforce federal laws. Defendant Garland maintains his principal place of business in the District of Columbia.

29.     Defendant Antony Blinken is the Secretary of State. Blinken is sued herein solely in his official capacity as the public official with control over the conduct of the Department of State. The Department of State negotiated and entered into the Claims Settlement Agreement, including related agreements and understandings, and is responsible for implementing the Sudan Claims Resolution Act. Defendant Blinken maintains his principal place of business in the District of Columbia.

## STATEMENT OF FACTS

### A.  Hamas

30.     Hamas – The Islamic Resistance Movement was founded in December 1987.[2]

31.     Hamas' official charter calls for the annihilation of the State of Israel and the creation of an Islamic state in the territory comprising Israel, the West Bank and the Gaza Strip. Since its founding, Hamas has sought to achieve this goal by using terrorist violence to weaken, undermine and demoralize the State of Israel, and Israel's population, institutions, and economy. Hamas' founding charter explicitly provides that the "usurpation of Palestine by the Jews" should be reversed through a "holy war" and the use of violence.

---

[2]     The name "Hamas" is an acronym for the Arabic phrase *Harakat al-Muqawamah al- Islamiyya* which means "The Islamic Resistance Movement."

32.    At all relevant times, Hamas has carried out terrorist attacks through its military wing, known as the Izz A-Din Al-Qassam Brigades ("Al-Qassam Brigades").

**B.  Sudan Shared Hamas' Goals and Supported its Terrorist Activities**

33.    In June 1989, Colonel Omar al-Bashir initiated a military coup in Sudan and established an Islamic government which was deeply hostile to the United States and to Israel.

34.    Since August 12, 1993, until the present time, Sudan has been continuously designated by the United States Department of State as a state sponsor of terrorism pursuant to Section 6(j) of the Export Administration Act of 1979 (50 U.S.C. § 2405(j)).

35.    During all periods relevant to this suit, it has been the continuous and official policy of Sudan to use terrorism against the United States and its allies, including Israel, to advance its interests both domestically and abroad. By providing material support and resources to terrorist organizations, Sudan was able to enlist these terrorist proxies to carry out attacks against the United States and Israel, and advance Sudanese interests around the world.

36.    Towards these ends, Sudan has provided massive material support and resources to numerous anti-American and anti-Israel terrorist organizations, including Hamas, which shares Sudan's violently anti-American and anti-Israel ideology and goals.

**C.  Sudan's Provision of Material Support and Resources to Hamas**

37.    During the period relevant hereto, Sudan provided Hamas with material support and resources within the meaning of 28 U.S.C. § 1605A(a)(1), described below, with the specific intention of causing and facilitating the commission of acts of extrajudicial killing, including the Terrorist Attack. Such support was provided continuously, routinely and in furtherance and as implementation of a specific policy and practice established and maintained by Sudan, in order to assist Hamas achieve goals shared by Sudan.

38.    Sudan provided the material support and resources detailed below pursuant to an agreement reached between Sudan and Hamas in the years prior to the Terrorist Attack. Under that agreement, Hamas undertook to carry out acts of extrajudicial killing and terrorism against Jews in Israel, and in return Sudan undertook to provide Hamas with material support and resources to carry out such extrajudicial killings and terrorist attacks.

39.    Sudan provided Hamas with the material support and resources detailed below through officials, employees, and agents of Sudan (hereinafter: "Officials and Agents").

40.    The material support and resources that were provided to Hamas by Sudan and its Officials and Agents in the years immediately prior to the Terrorist Attack for the purpose of facilitating acts of extrajudicial killing and terrorism included inter alia: provision of financial support to Hamas; provision of specialized and professional military training for the planning and execution of terrorist attacks (hereinafter: "terrorist training") to Hamas; providing use of training bases and military facilities in which terrorist training was provided to Hamas and its operatives; providing Hamas and its leaders and operatives safe haven and refuge from capture; providing Hamas means of electronic communication; providing Hamas with financial services, including banking and wire transfer services; and providing Hamas means of transportation.

41.    Sudan and its Officials and Agents gave substantial aid and assistance to Hamas, and provided the massive material support and resources described above to Hamas, and thereby aided and abetted Hamas, all with the specific intention of causing and facilitating the commission of acts of extrajudicial killing, including the Terrorist Attack. Sudan and its Officials and Agents did so with actual knowledge that Hamas had killed and injured U.S. citizens in terrorist attacks and that additional U.S. citizens and other persons would be killed and injured as a result of their aiding, abetting, and provision of material support and resources to Hamas.

42. Sudan and its Officials and Agents knowingly and willingly conspired, agreed and acted in concert with Hamas, in pursuance of the common plan, design, agreement and goals discussed above, to cause and facilitate the commission of acts of extrajudicial killing, including the Terrorist Attack. Sudan and its Officials and Agents did so with actual knowledge that Hamas had killed and injured U.S. citizens and that additional U.S. citizens and other innocent civilians would be killed and injured as a result of their conspiracy with Hamas.

43. At all relevant times, Sudan's Officials and Agents were officials, employees, and/or agents of Sudan, and performed actions on behalf of Sudan, in furtherance of the interests and policy of Sudan, and within the scope of their office, employment and agency, within the meaning of 28 U.S.C. §§ 1605A(a)(1) and 1605A(c), which caused the Terrorist Attack and harm to the plaintiffs herein, in that Sudan's Officials and Agents authorized, planned and caused the provision of funds, terrorist training and other material support and resources by Sudan to Hamas for the commission of acts of extrajudicial killing including the Terrorist Attack.

44. Sudan authorized, ratified and approved the actions described herein of its Officials and Agents, and is therefore vicariously liable for those actions.

**D.** **The Terrorist Attack**

45. On November 30, 1993, U.S. citizen Yitzchak Weinstock, then 19, stayed the night at the home of his grandparents, Rabbi Simon Dolgin and Shirley Doglin, in Jerusalem.

46. Yitzchak had spent the previous year studying in a yeshiva located north of Jerusalem, and he planned to travel the following morning to pay a visit to his rabbis, teachers, and friends at the yeshiva.

47.     The next morning, December 1, 1993, Yitzchak traveled from his grandparents' home to Highway 60, a major North-South artery that runs from the city of Nazareth in the Galilee to the city of Beer Sheba in the Negev desert, intersecting Jerusalem.

48.     Yitzhak hitched a ride with a private car headed north on Highway 60. In addition to Yitzhak and the driver, the driver's daughter and another hitchhiker, Shalva Ozana, were also in the car. A short time later, about nine miles north of Jerusalem, the car's exhaust pipe developed a problem, and the driver stopped his car on the side of the road. The driver got out of the car to fix the problem, and Yitzhak also exited the car, to help the driver with the repair.

49.     At an unknown time prior to December 1, 1993, Hamas' military wing, the Al-Qassam Brigades, had planned, conspired and made preparations to carry out a terrorist shooting on Highway 60 north of Jerusalem.

50.     Pursuant to the aforementioned plan, a vehicle containing three terrorist operatives of Hamas' Al-Qassam Brigades armed with automatic assault rifles approached Yitzhak and the driver as they were attempting to resolve the exhaust pipe problem. The Hamas vehicle pulled up alongside the disabled car, and the terrorists inside opened fire with their automatic weapons on Yitzhak and his traveling companions. The Hamas vehicle then sped from the scene and successfully escaped.

51.     Yitzhak and the other hitchhiker, Shalva Ozana, were both hit by the Hamas machine-gun fire. Ms. Ozana, a 24-year-old kindergarten teacher, was killed on the spot, and Yitzhak was mortally wounded. Paramedics performed emergency procedures on Yitzhak at the scene and rushed him to Hadassah Medical Center in Jerusalem. A team of doctors at Hadassah attempted to save Yitzhak's life for some 18 hours, but he died of his wounds early the following day, December 2, 1993.

52.     In an official written Arabic-language communiqué distributed by Hamas a short time later in the West Bank (which was obtained by Israeli authorities and included in a still-classified intelligence survey to which plaintiffs were recently permitted special access) Hamas confirmed that it had carried out the Terrorist Attack in which Yitzhak Weinstock was murdered.

53.     Hamas was enabled to, and did in fact: recruit, indoctrinate, conceal, and train the operatives who carried out the Terrorist Attack; purchase the weapons and vehicle used in the Terrorist Attack; build, maintain and activate the human, material, and operational infrastructure needed and used to plan, organize and execute the Terrorist Attack; and take all the other steps necessary to carry out the Terrorist Attack; as the result of, due to, and by utilizing, the financial support, personnel, organization-building activities and assistance, and other material resources and support that were provided to Hamas by Sudan.

54.     On October 20, 2020, the Plaintiffs filed this action against Sudan.

**E.  The U.S. and Sudan Entered into the Claim Settlement Agreement**.

55. On October 30, 2020, the United States and Sudan signed a Claims Settlement Agreement. U.S.-Sudan Claims Settlement Agreement, Oct. 30, 2020, T.I.A.S. No. 21-209 (entered into force Feb. 9, 2021), Exhibit A.

56. The preamble to the CSA recognizes the 1998 bombings of the U.S. embassies in Nairobi, Kenya and Dar es Salaam, Tanzania (the "Embassy Bombings") and the 2000 attack on the U.S.S.  Cole (the "Cole Attack"). CSA at 2. And without assigning responsibility for those attacks to Sudan, the CSA recognizes Sudan's willingness to address claims arising out of those attack. *Id*. at 3. The preamble does not mention any other terrorist attacks that have been attributed to Sudan.

57. Article II of the CSA specifies the following objectives of the government's action: (a) settling claims of the United States and of U.S. nationals, through espousal; (b) providing meaningful compensation to foreign national terrorism victims who were employed, or performed contracts awarded, by the United States; and (c) barring all terrorism lawsuits by U.S and foreign nationals. CSA at 5.

58. Article III requires the United States to confirm that the necessary legislation has been enacted that restores foreign sovereign immunity to Sudan for terrorism cases. CSA at 6. It also requires Sudan to pay to the United States $335 million to be distributed by the U.S. government as provided in the Annex to the CSA. *Id.*

59. The Annex to the CSA specifies certain claimants that are to receive shares in the distribution. CSA at 10-11. But by identifying certain claimants for compensation, the CSA excluded only one small group of victims of Sudan sponsored terrorism.

60. Under the CSA, the ***only*** Sudan terrorism victims who receive no compensation for the extinguishment of their claims are U.S. national claimants (including the Weinstocks) whose claims arise out of Sudan-sponsored terrorist attacks carried out by the Hamas terrorist organization -- the "Hamas Victims."

61. The classifications established by the CSA and Act in no way further the CSA's articulated purposes.

62. The CSA provides no standards that determine which claimants receive payment under the CSA and which claimants do not. But the allocation of hundreds of millions of dollars to all but a single class of U.S. claimants does not square with the stated purposes of the CSA or with the Equal Protection Clause of the Constitution.

63. The claimants who were compensated under the CSA include victims who purportedly entered into "***private***" settlement agreements with Sudan, such as:

    a.  U.S. nationals who are parties to certain identified lawsuits against Sudan that arose out of the Embassy Bombings and the Cole Attack;

    b.  U.S. national Plaintiffs in a separate action against Sudan brought by the survivors of an employee of United States Agency for International Development (USAID) who was assassinated in Sudan in 2008; and,

    c.  the ***foreign national*** plaintiffs in *Mwila v. The Islamic Republic of Iran*, case no. 08-cv-1377.

CSA at 10, Annex ¶ 1.a. and b.

64. In both the district court and the court of appeals in *Mark v. Republic of the Sudan*, Case No. 21-5250 (D.C. Cir.), Sudan and the government argued that the Hamas Victims were not compensated under the CSA and the Act ***because***, unlike other claimants, the Hamas Victims had not entered into so-called "private settlement agreements" with Sudan. See e.g., Govt. Br. at 15; *see also*, Sudan Br. at 7, 24-26 (D.C. Cir. Case no. 21-5250).

65. Similarly, in *Steinberg v. Republic of the Sudan*, Sudan and the government also represented to the court that the Hamas Victims were singled out to be denied compensation ***because***, unlike other claimants, the Hamas Victims had not entered into so-called "private settlement agreements" with Sudan.

66. In fact, as the Plaintiffs learned after the Hamas Victims' complaints were filed, these so-called "private settlement agreements" were procured through negotiations ***by the United States government*** with Sudan. They were not "private" agreements.

67. Deeming these individual settlements that were negotiated in secret "private settlement agreements" the government sought to conceal its role in the negotiation of those individual settlements.

68. Notably, one of the cases in which claimants who had allegedly entered into "private settlement agreements" with Sudan was *Taitt v. Islamic Republic of Iran*, case no. 20-cv-1557 (D.D.C.). *Taitt* was filed on June 12, 2020, **twenty years after** the attack on the USS Cole, upon which the lawsuit was based, and only months before the CSA was signed.

69. Other cases arising out of Sudan's role in the bombing of the Cole were filed in 2004 (see *Rux v. Republic of Sudan*, 495 F. Supp. 2d 541 (E.D. Va. 2007)) and 2010 (see *Flanagan v. Islamic Republic of Iran*, 87 F. Supp. 3d 93 (D.D.C. 2015)).

70. The Taitt plaintiffs were represented by one of the most politically connected law firms in the District of Columbia.

71. The late-filing of *Taitt* and the fact that the plaintiffs were represented by one of the best-connected law firms in the District of Columbia indicate that the *Taitt* plaintiffs were invited to file suit and to be included in the benefits of any distribution to be made under the impending settlement between the United States and Sudan.

72. The "private settlement agreements" were not the reason certain claimants were compensated under the CSA. Rather, the government arranged for Sudan to enter into individual settlement agreements with certain specified victims as a pretext to favor those victims over other victims of Sudan-sponsored terrorism, including the Weinstocks and the other Hamas Victims.

73. In a June 11, 2021 press release issued by USAID, the government inadvertently revealed that the so-called "private settlement agreements" were entered into pursuant to

other prior **undisclosed** agreements between the United States and Sudan to further negotiations over the restoration of Sudan's sovereign immunity.

74. The USAID press release, titled, "Statement by Administrator Samantha Power, Compensation Delivered to Family of USAID Employee Killed in Line of Duty in Sudan," stated that the private settlement agreements were made in favor of "specific victims of terrorist attacks" **as part of the negotiations** between the United States and Sudan for restoration of Sudan's foreign sovereign immunities.

75. Thus, rather than justifying the disparate treatment of the Hamas Victims, the private settlement agreements with "**specific victims**" were imposed by the U.S. government upon Sudan **as a condition precedent for** the restoration of Sudan's foreign sovereign immunities and the espousal of the terrorism claims against Sudan.

76. The press release previously appeared on the USAID website at: https://www.usaid.gov/news-information/press-releases/jun-11-2021-compensation-delivered-family-usaid-employee-killed-line-duty-sudan. USAID has removed or relocated the press release. However a true copy of the Press Release remains available on the Internet Archive at: https://web.archive.org/web/20210623204135/https://www.usaid.gov/news-information/press-releases/jun-11-2021-compensation-delivered-family-usaid-employee-killed-line-duty-sudan. A true copy of the press release printed from the Internet Archive filed herewith as Exhibit C.

77. In its D.C. Circuit appellate brief in the *Mark* case, Sudan affirmatively and falsely asserted that the "private settlement agreements" were beyond constitutional scrutiny because "they do not involve state action by any U.S. government entity." Sudan Br. at 25, *Mark v. Sudan*, case no. 21-5250 (D.C. Cir.).

78. In *Steinberg v. Republic of Sudan*, No. 20-CV-2996 (RCL), 2023 WL 2682369 (D.D.C. Mar. 29, 2023), Sudan and the government similarly misled the court by denying the government's active role in reaching the "private settlement agreements." In *Steinberg*, as in *Mark*, Sudan argued that the private settlement agreements were beyond constitutional scrutiny because they did not involve government action. *Id.* at *8 n.13. Accepting these misrepresentations, the *Steinberg* court held, "these private settlement agreements were already in existence at the time of the CSA." The court clearly did not understand that the so-called private settlement agreements were part of the CSA.

79. Contrary to the misrepresentations made by the government and Sudan to the courts in *Mark* and *Steinberg*, rather than providing a justification for the disparate treatment of the Hamas Victims under the CSA and Act, the U.S. government-negotiated "private settlement agreements" are additional manifestations of unreasonable disparate treatment of the Hamas Victims, including the Plaintiffs herein. [3]

80. After the D.C. Circuit's ruling in *Mark*, Sudan's counsel, White & Case, dispelled any doubt as to whether counsel knew that the government was actively involved in the so-called "private settlement agreements." White and Case issued a press release admitting that the law firm negotiated the settlement agreement on behalf of Sudan. *See, White & Case achieves victory in DC Circuit on behalf of Sudan*, July 27, 2023, https://www.white-case.com/news/press-release/white-case-achieves-victory-dc-circuit-behalf-sudan    (Exhibit D).

---

[3] The USAID press release and the extent of the deception were only discovered by undersigned counsel during the briefing of the Appellate Reply Brief in *Mark*, and therefore, this issue was never addressed by the courts.

81. While providing for payment of the claimants pursuant to the government-orchestrated "private settlement agreements," and for the establishment of a commission to hear and pay claims of foreign national claimants whose claims arose out of the Embassy Bombings, the CSA provides the Weinstocks with neither payment of their claims nor an alternative forum in which they can have their claims heard.

82. Notably, the means by which the U.S. Government settled the claims of the U.S. national claimants was through espousal a process that makes the claims the subject of a formal claim for reparation to be paid by the responsible government. CSA Articles II(1), IV(1), (2)(d).

83. However, the United States did not make the Weinstocks' claims the subject of a formal claim for reparation.

84. The United States espoused the claims of the Hamas Victims, including the Weinstocks, in exchange for compensation to *all* of Sudan's *other* terrorism victims – even to those who are not U.S. nationals. Only the Hamas Victims are excluded from compensation under the CSA.

**F.  The Sudan Claims Resolution Act**.

85. As contemplated under the CSA, Congress enacted the Sudan Claims Resolution Act as part of the Consolidated Appropriations Act of 2021. Pub. L. No. 116-260 (2020). Exhibit B.

86. Among other things, the Act strips the federal courts of jurisdiction to hear most terrorism related claims against Sudan, restores Sudan's foreign sovereign immunity as to (almost) all claims arising out of Sudan's involvement in international terrorism, and makes

inapplicable to Sudan (almost) any private right of action relating to state sponsors of terrorism.  Act § 1704.

87. Like the CSA, the Act distributes benefits and burdens of the settlement in an arbitrary and capricious manner.

88. While stripping the courts of subject matter jurisdiction to hear terrorism cases against Sudan, the Act legislates a rule-swallowing exception that allows the 9/11 multidistrict claims to proceed. Act § 1706. The Act provides that "the terrorism-related claims of victims and family members of the September 11, 2001, terrorist attacks must be preserved and protected." Act § 1702(3).

89. The Act further provides that the terrorism claims against Sudan of the victims and family members of the 9/11 Attacks are not extinguished; they *remain pending* in the multidistrict proceeding in the Southern District of New York (Case No. 03-MCL-1570). Act § 1706.

90. The September 11 claimant carve-out is based upon the following Congressional finding:

> It is the long-standing policy of the United States that civil lawsuits against those who support, aid and abet, and provide material support for *international terrorism* serve the national security interest of the United States by deterring the sponsorship of terrorism and by advancing interests of *justice, transparency, and accountability*.

Act § 1706(a)(1) (emphasis added).

91.    The CSA and the Act provide compensation for all Sudan-sponsored terrorism victims other than the Hamas Victims, and the Act strips jurisdiction to hear any remaining cases other than the 9/11 multi-district litigation. Thus, despite the proclaimed "long-standing policy" to allow civil actions against those who support *international* terrorism and in contravention of the

asserted "interests of justice, transparency, and accountability," the CSA and the Act together nullify *only* the Plaintiffs' claims (and those of other Hamas Victims) against Sudan for its undeniable provision of material support to Hamas.

92.    The Act also provides for additional "lump sum" payments to 9/11 Victims, spouses, and dependents. Act § 1705.

93.    The Act also appropriates an additional $150 million (over and above the $335 million paid by Sudan) for increased payments to Embassy Bombings victims and their family members who, subsequent to the Embassy Bombings, became naturalized American citizens. Act § 1707(a).

94.    This appropriation is claimed to be intended to achieve parity between the ***naturalized*** American citizen claimants and the claimants who were previously U.S. nationals. *Id.*

95.    But no appropriation has been made to achieve parity between Plaintiffs and the other victims of Sudan-sponsored terrorism or to otherwise compensate the Weinstocks for the termination of their claims.

96.    Instead, the CSA and Act terminated the Hamas Victims' claims in exchange for the compensation of ***all other*** alleged victims of Sudan-sponsored terrorism.

97. The Act conditioned restoration of Sudan's foreign sovereign immunity upon a certification from the Secretary of State confirming that Sudan has made, and the U.S. government has received the payments due under the purported "private settlement agreements" that were entered into under the CSA. § 1704(a)(2)(B) and (C); see also § 1707(c)(2)(B).

**G.  The D.C. Circuit Construes the Act to Preclude Federal Courts from Hearing Constitutional Challenges to the CSA and the Act, individually and together**.

98. After the district court granted Sudan's motion to dismiss their complaint, the *Mark* plaintiffs appealed to the D.C. Circuit. D.C. Cir. Case no. 21-5250. While the *Mark* plaintiffs did

not assert a cause of action to declare the CSA and the Act unconstitutional (neither of which was in effect at the time the Marks filed their complaint), they had opposed the motion to dismiss by arguing that the CSA and the Act were unconstitutional.

99. The D.C. Circuit affirmed the dismissal. *Mark v. Republic of the Sudan*, 77 F.4th 892 (D.C. Cir. 2023).

100. The court held that the Act stripped the court of jurisdiction to even consider the Marks' constitutional challenges to the CSA, to the Act, and to the effect of the two together.

### FIRST CAUSE OF ACTION
**BY PLAINTIFFS SHARON WEINSTOCK, MOSHE WEINSTOCK, GEULA WEINSTOCK, ARYEH WEINSTOCK, CHAIM WEINSTOCK, AND THE ESTATES OF YITZCHAK WEINSTOCK, RABBI SIMON DOLGIN, AND SHIRLEY DOLGIN**
<u>**ACTION FOR DAMAGES UNDER 28 U.S.C. § 1605A(c)**</u>

101. The preceding paragraphs are incorporated by reference as though fully set forth herein.

102. Sudan is a foreign state that since August 1993 has continuously been designated as a state sponsor of terrorism within the meaning of 28 U.S.C. § 1605A.

103. Sudan provided to Hamas material support and resources, within the meaning of 28 U.S.C. § 1605A, which caused and facilitated the Terrorist Attack.

104. Sudan conspired with Hamas to carry out the Terrorist Attack.

105. Sudan's Officials and Agents are officials, employees, and/or agents of Sudan, and they provided the material support and resources which caused and facilitated the Terrorist Attack, and conspired with Hamas to carry out the Terrorist Attack, all while acting within the scope of their office, employment, and agency.

106. Hamas is an agent of Sudan, and it carried out the Terrorist Attack while acting within the scope of its agency.

107.    The Terrorist Attack was an extrajudicial killing within the meaning of 28 U.S.C. § 1605A.

108.    The Terrorist Attack caused the decedent, his estate, plaintiffs Sharon Weinstock, Moshe Weinstock, Geula Weinstock, Aryeh Weinstock, and Chaim Weinstock, and decedents Rabbi Simon Dolgin and Shirley Dolgin, severe injury, including: pain and suffering; economic damages and loss of income; loss of guidance, companionship and society; loss of consortium; severe emotional distress and mental anguish; and loss of solatium.

109.    The Terrorist Attack and the harm and injuries suffered by the plaintiffs were the direct and proximate result of Sudan's conduct described herein.

110.    Sudan is therefore liable for the full amount of plaintiffs' damages under 28 U.S.C. § 1605A(c), in such sums as may hereinafter be determined.

111.    Sudan's conduct was criminal, outrageous, extreme, willful, malicious, and a threat to the public, warranting an award of punitive damages under 28 U.S.C. § 1605A(c).

**SECOND CAUSE OF ACTION
BY PLAINTIFF ESTATE OF DOV WEINSTOCK
<u>NEGLIGENCE</u>
(Under the Law of the State of Israel)**

112.    The preceding paragraphs are incorporated by reference as though fully set forth herein.

113.    Decedent Dov Weinstock, the late father of decedent U.S. citizen Yitzchak Weinstock, was himself not a U.S. citizen and his estate is not entitled to bring claims against defendant Sudan under the federal cause of action provided by 28 U.S.C. § 1605A(c). The Estate of Dov Weinstock therefore asserts its claims against Sudan under the law of the State of Israel.

114.    Causes of action in tort in Israeli law are codified in the Civil Wrongs Ordinance (New Version) - 1968 ("CWO"). Section 35 of the CWO creates a tort of Negligence, and provides in relevant part that a person is liable for Negligence when he commits an act which a reasonable and prudent person would not have committed under the circumstances, and thereby harms another person toward whom, under those circumstances, he is obligated not to act as he did. "Israeli law thus imposes liability for negligence in a manner roughly similar to American tort law: liability attaches where one has a duty to another and breaches that duty, causing injury to the other." *Wultz v. Islamic Republic of Sudan*, 755 F. Supp. 2d 1, 58 (D.D.C. 2010).

115.    CWO § 36 provides that the duty of care in CWO § 35 is toward all persons, to the extent that a reasonable person would have foreseen under the same circumstances that, in the ordinary course of events, they were liable to be injured.

116.    Under binding precedent of the Israeli Supreme Court, the tort of Negligence under the CWO also applies to intentional and/or reckless conduct.

117.    Sudan committed acts which a reasonable and prudent person would not have committed under the circumstances. Sudan acted negligently in connection with decedents Yitzchak Weinstock and Dov Weinstock, toward whom, in the circumstances described herein, Sudan had an obligation not to act as it did. Sudan was obligated not to act as it did because a reasonable person would have foreseen, under the circumstances, that in the ordinary course of events, these decedents were liable to be injured by Sudan's acts described herein.

118.    Sudan's behavior therefore constitutes Negligence under the Israeli CWO, and as a result of Sudan's negligent behavior Yitzchak Weinstock was murdered and decedent Dov Weinstock was severely injured.

119.    The murder of Yitzchak Weinstock caused decedent Dov Weinstock severe injury, including: economic damages and loss of income; loss of companionship and society; loss of consortium; and severe emotional and mental distress, anguish and injury.

120.    Sudan is therefore liable for the full amount of decedent Dov Weinstock's damages, in such sums as may hereinafter be determined.

121.    Sudan's conduct was criminal, outrageous, extreme, willful, malicious, and a threat to the public, warranting an award of punitive damages.

### THIRD CAUSE OF ACTION
### BY PLAINTIFF ESTATE OF DOV WEINSTOCK
### AIDING AND ABETTING
### (Under the Law of the State of Israel)

122.    The preceding paragraphs are incorporated by reference as though fully set forth herein.

123.    Aiding-and-abetting liability is recognized in Israeli law in § 12 of the CWO, which provides that a person who participates in, assists, advises or solicits an act, committed or about to be committed by another person, or who orders, authorizes, or ratifies such an act, is liable for such act.

124.    Sudan assisted Hamas to carry out the Terrorist Attack and is therefore liable under CWO § 12 for the full amount of decedent Dov Weinstock's damages, in such sums as may hereinafter be determined.

125.    Sudan's conduct was criminal, outrageous, extreme, willful, malicious, and a threat to the public, warranting an award of punitive damages.

### FOURTH CAUSE OF ACTION
### ACTION FOR DECLARATORY RELIEF UNDER  28 U.S.C. §§ 2201 AND 2202
### AND THE  DUE PROCESS CLAUSE OF THE FIFTH AMENDMENT OF THE UNITED
### STATES CONSTITUTION
### (Equal Protection Claim)

**Against Defendants United States, Garland, and Blinken**

126. Plaintiffs reallege and incorporate all previous paragraphs as if fully set forth herein.

127. Plaintiffs seek a declaratory judgment from this Court ruling that the CSA and the Act are unconstitutional and void as they violate the Weinstocks' rights to equal protection under the Fifth Amendment.

128. The Department of State, on behalf of the United States and under the control and direction of Secretary Blinken, negotiated and implemented the CSA.

129. The Department of State, on behalf of the United States and under the control and direction of Secretary Blinken, conducted the preliminary negotiations with Sudan and others in furtherance of reaching a settlement agreement with Sudan.

130. In conducting the preliminary negotiations with Sudan and others, the Department of State, on behalf of the United States and under the control and direction of Secretary Blinken, reached agreements with Sudan that obligated Sudan to enter into individual settlement agreements with certain specified victims of Sudan-sponsored terrorism.

131. The Department of State, on behalf of the United States and under the control and direction of Secretary Blinken conditioned the espousal of terrorism claims against Sudan and the restoration of Sudan's foreign sovereign immunity upon Sudan's entering into these individual settlement agreements with particular victims of Sudan-sponsored terrorism.

132. The Department of State, on behalf of the United States and under the control and direction of Secretary Blinken deliberately did not condition any relief for Sudan upon Sudan's entering into individual settlement agreements with the Weinstocks or the other Hamas Victims.

133. The Department of State, on behalf of the United States and under the control and direction of Secretary Blinken called the individual settlement agreements that it had arranged,

"private settlement agreements." However, the individual settlement agreements were the result and product of pressure applied upon Sudan by the United States government.

134. The so-called "private settlement agreements" were the product of state action by the U.S. government.

135. In its preliminary negotiations with Sudan, the Department of State, on behalf of the United States and under the control and direction of Secretary Blinken treated the Hamas Victims differently than similarly situated victims of Sudan-sponsored terrorism.

136. The CSA and the Act, and the two operating together, treat Hamas Victims of Sudan-sponsored terrorist attacks, including the Plaintiffs, differently than all other victims of Sudan-sponsored terrorist attacks.

137. Because of this disparity, the United States, through the Department of State, agreed to espouse the Weinstocks' claims without providing them with any compensation or other relief such as an alternative forum within which to pursue their claims. In contrast, the United States, through the Department of State under the control and direction of Secretary Blinken, entered into the CSA which provided compensation to all other victims of Sudan-sponsored terrorism besides the Hamas Victims.

138. The CSA creates classifications that single out one small class of Sudan-sponsored terrorism victims (the Hamas Victims) and treats that class differently than all other victims of Sudan-sponsored terrorism.

139. The Act also treats the Hamas Victims differently than all other victims of Sudan Sponsored Terrorism by, among other things, failing to provide them with compensation in exchange for the espousal of their claims and for the restoration of Sudan's foreign sovereign immunity, and by failing to allow the Weinstocks and the other Hamas Victims to maintain their

actions against Sudan.

140. The constitutionality of the Act cannot be separated from that of the CSA. The Act and the CSA were two parts of a single government action, policy, and course of conduct.

141. The Act and, specifically, its jurisdiction-stripping provision were enacted pursuant to and in performance of the CSA.

142. The jurisdiction-stripping provision of the Act was explicitly contingent upon the performance of the obligations of the CSA.

143. Because the provisions of the CSA and the Act were so interdependent, any constitutional infirmities in the CSA must be attributed to the Act.

144. Contrary to the "interests of justice, transparency, and accountability," the CSA and the Act were negotiated secretly and exclusively in consultation with private lawyers for the favored claimants and for the benefit of those clients alone.

145. As a result, the CSA divides the settlement proceeds among only certain specified victims and the Act expressly provides lump sum payments for others. Act § 1705.

146. The Hamas Victims were forced to bear the burdens of the settlement agreement between the United States and Sudan however unlike all other victims of Sudan-sponsored terrorism, the Hamas Victims received none of the benefits of the settlement.

147. The CSA and the Act, and the operation of the two together also violate the Weinstocks' rights to equal protection because the disparate treatment of the Hamas Victims significantly interferes with their exercise of their right to seek recourse through the courts while leaving that access intact for other similarly situated terrorism victims whose claims are not impacted by the CSA or the Act.

148. The disparate treatment of the Hamas Victims lacks any legal justification and is in

27

violation of the right of equal protection secured by the Fifth Amendment to the Constitution of the United States.

### FIFTH CAUSE OF ACTION
### ACTION FOR DECLARATORY RELIEF UNDER 28 U.S.C. §§ 2201 AND 2202 AND THE DUE PROCESS CLAUSE OF THE FIFTH AMENDMENT OF THE UNITED STATES CONSTITUTION
### (Due Process and Separation of Powers Claim)
### Against Defendants United States, Garland, and Blinken

149. Plaintiffs reallege and incorporate all previous paragraphs as if fully set forth herein.

150. The Act, as construed by the D.C. Circuit, strips federal courts of jurisdiction to consider the Weinstocks' constitutional claims.

151. Any statute that denies a judicial forum for a colorable constitutional claim is unconstitutional and is an infringement of due process and constitutional separation of powers.

152. Alternatively, and implicitly in contrast to the D.C. Circuit's construction of the Act, the jurisdiction-stripping provision must be construed to allow the Weinstocks' constitutional challenges to proceed.

153. The Act is unconstitutional to the extent that it precludes federal courts from considering the Weinstocks' constitutional challenges to the CSA, to the Act, and to the two together.

**WHEREFORE**, Plaintiffs demand judgment against Defendant Sudan as follows:

   a. Judgment against defendant Sudan for compensatory damages in an amount to be determined at trial, which are not less than $180,000,000 (one hundred eighty million dollars);
   b. Judgment against Sudan for punitive damages in an amount to be determined at trial;
   c. Plaintiffs' costs and expenses;
   d. Plaintiffs' attorneys' fees; and
   e.  Such further relief as the Court finds just and equitable.

**WHEREFORE**, Plaintiffs demand judgment against Defendants United States, Garland, and Blinken as follows:

a. Declaratory judgment finding the CSA, the Act, and/or the two together are unconstitutional and void as written or as applied;

b. Judgment enjoining Defendants United States. Garland, and Blinken from giving effect to the CSA and the Act as written or as applied;

c. Alternatively, if the Court determines that injunctive relief is an insufficient remedy, Plaintiffs asks for a writ of mandamus to compel Defendants United States, Garland, and Blinken to treat the CSA and the Act as null and void as they carry out their duties;

d. Declaratory judgment finding the Act's jurisdiction-stripping provision to be unconstitutional and unenforceable as it deprives federal courts of jurisdiction to consider the Weinstocks' constitutional claims;

e. Declaratory judgment construing the Act's jurisdiction-stripping provisions narrowly to allow the consideration of Plaintiffs' constitutional claims (a construction that implicitly conflicts with the D.C. Circuit's ruling in *Mark*), or, in the alternative deeming such a construction to be precluded by the D.C. Circuit's ruling in *Mark*;

f. Plaintiffs' costs and expenses;

g. Plaintiffs' attorneys' fees;

h. Such further relief as the Court finds just and equitable;

i. Plaintiffs further request that this Court retain jurisdiction of this action until Defendants United States, Garland, and Blinken have complied with any and all orders issued by the Court.

May 29, 2024                          Plaintiffs, by their attorneys,


                                     /s/ Asher Perlin
                                     Asher Perlin
                                     Bar I.D. FL0006
                                     LAW OFFICE OF ASHER PERLIN
                                     4600 Sheridan Street, Suite 303
                                     Hollywood, Florida 33021
                                     (786) 687-0404
                                     asher@asherperlin.com